Filed 7/23/14  In re Marriage of Kamzan CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re Marriage of MORTON and COLLEEN M. MCGOVERN KAMZAN. | B241526 (Los Angeles County Super. Ct. No. LD059436) |
| MORTON A. KAMZAN, Appellant, v. COLLEEN M. MCGOVERN KAMZAN, Respondent. | |

APPEAL from orders of the Superior Court of Los Angeles County, Michael J. Convey, Judge.  Affirmed.

Morton A. Kamzan, in pro. per.; and Alan M. Goldberg for Appellant.

Gibson, Dunn & Crutcher, Richard J. Doren and Michael Holecek; Colleen M. McGovern Kamzan, in pro. per., for Respondent.

_____

Petitioner and appellant Morton A. Kamzan (Husband) and respondent Colleen M. McGovern Kamzan (Wife) were married on December 12, 2002. On March 18, 2011, Husband filed a petition for marital dissolution. Husband appeals from an October 7, 2011 order awarding Wife spousal support and attorney fees and from the temporary restraining order (TRO) issued against him on the same date. We affirm the orders.

*PROCEDURAL AND FACTUAL BACKGROUND*

Husband is a lawyer and a medical doctor who practices medical malpractice and workers' compensation law. Wife is a court reporter. Each has children from a prior marriage. Husband and Wife shared a bedroom in their house in Agoura Hills until April 2006, when Wife moved into her own bedroom. Wife's three children also lived in the house.

*Support*

Wife filed an application for an Order to Show Cause (OSC) on July 1, 2011, requesting spousal support, attorney fees, accounting fees and costs. She presented evidence of Husband's income in 2009 and 2010 with some information for 2011.

Husband also submitted financial documents which he had generated and a declaration explaining his circumstances, arguing he had no present ability to pay any support.

On October 7, 2011, the court ordered Husband to pay $3,654 per month in spousal support, support arrearages at the rate of $750 per month, a contribution towards forensic accounting fees in the amount of $7,500 and an initial contribution of $20,000 towards Wife's attorneys' fees.

*TRO*

On August 29, 2011, Wife filed an application for a domestic violence prevention order (Form DV 100) citing two incidents of domestic violence. She alleged that on August 11, 2011, when she was trying to take a photograph of Husband's bedroom, Husband lunged at her and bruised her forearm. She filed a police report shortly thereafter. She then alleged on August 27, 2011 he "body slammed" her when she was trying to get into his bedroom.

On October 7, 2011, the court granted a temporary restraining order in effect until October 5, 2014, which provided that Husband must stay at least 100 yards away from Wife, and must move out from the family home

CONTENTIONS ON APPEAL

Husband contends there was no substantial evidence for the support orders and that the issuance of the restraining order was error because the trial court was prejudiced against him.

DISCUSSION

I. Support Order

a. Evidence presented

In support of her application for the OSC, Wife submitted a declaration and an Income and Expense Declaration showing her gross income before expenses in 2010 ($39,625.84) and 2009 ($59,296). She attributed the drop in her income to "an economic downturn in the market" and because she had to assist Husband with a trial case and with personal matters.

She submitted Husband's Profit and Loss Statement for 2009 showing a net annual income of $280,330, resulting in a monthly income of $23,361. She also submitted a chart prepared by Husband which showed a net annual income in 2010 of $317,368.92, resulting in a monthly income of $26,447. She stated his 2011 income would be consistent with his earnings in 2010. She outlined work which he performed for other law firms and provided lists of cases in which he is either attorney of record or co-counsel. She also indicated he received insurance disability checks of $7,000 per month.

Husband also submitted a declaration which refuted Wife's documentation. He submitted his own charts which he claimed were a more accurate accounting of his law practice's income and expenses. His gross amount of income in 2010 was $356,153, and after expenses, it was $211,726.37. He included a chart showing household expenses of $309,197.91 to indicate they spent much more than he earned. He claimed Wife had made extravagant expenditures of home remodeling and luxury vacations, as well as for his and Wife's children.

3

Husband stated in his declaration that the law firms which used to hire him for several depositions per month gave him much less work because of the downturn in the economy. He had a few good cases, but was barely making ends meet because of the expenses incurred in remodeling the family home. His disability payments ended when he turned 65 years old, in August 2011. He stated that since the beginning of 2011, his total gross business income was only $16,651. His average monthly income was therefore $2,650, less than his basic monthly business expenses. In the past, their income was not enough to pay for basic necessities of life and the home was in foreclosure. He stated that Wife spent far more than they could afford and did not help him substantially in his practice.

On August 2, 2011, Husband submitted an Amended Income and Expense Declaration which indicated that he earned no income in the preceding 12 months due to "Business reversals, lost case, personal illness [Disability income ends on 8-28-11 at age 65]." He indicated monthly expenses of $8,966.

On September 30, 2011, Husband submitted another Income and Expense declaration which showed no income from his firm, but an average income of $1,367 per month for deposition work ($16,400 annually), and monthly expenses of $5,261, which exceeded his income.

The hearing on the OSC took place on October 7, 2011. Wife's counsel argued that Husband's 2010 income, taken from the Profit and Loss statement Husband prepared, after deductions for business expenses, would be $22,152 per month. For 2009, his monthly income would be $23,361. Husband, representing himself, argued that 2009 and 2010 were aberrations because they were the "best years I have ever had in my entire life" and he had no present ability to pay any support. He argued his revenue from all wages and self-employment in 2011 was approximately $17,000 per year, or $1,367 per month.

b. *Ruling*

The court concluded that based on the evidence of Husband's income in the years 2009, 2010 and 2011, support should be based on a monthly income of $15,626 and

4

Wife's monthly income of $2,800. It calculated Husband's monthly income by using the average of $23,361 (2009), $22,152 (2010), and $1,367 (2011).

The court stated, inter alia, "[T]he court is guided principally by . . . . the case called *Riddle* [*In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075], . . . because [Husband's] income, in the best evidence that I have, fluctuated precipitously in the year 2011. [¶] Now, that can be attributed to not getting jobs, and I don't know really why, because in the two previous years in which this country has been in an unprecedented recession since the Great Depression, his income, gross receipts were well over $300,000 in both years . . . . The first necessity in this case is that [Wife] be permitted to resources to conduct a full, complete round of discovery and forensic analysis. . . to reconcile how such developments occurred in addition to what [Husband] argues today . . . that the parties, both of them, spent far beyond their means. . . Most of that income went right back into the house, and nothing was saved by a very cursory analysis. But temporary spousal support achieves the goal of maintaining the marital standard of living as best as possible and providing resources so that the supported party can become self-supporting as soon as possible. [¶] It . . . is also with some degree of skepticism that the court hears the evidence from [Wife's] side about being employed as a so-called freelance court reporter on income that is marginally greater than minimum wage. [¶] So the questions arise as to whether [Wife] is actively pursuing work and diligently taking the steps necessary to become self-supporting as soon as possible . . . . [¶] Under the case called *Riddle*, the court can't just look at the best years. The court must also look at the down years and take the best reasonable snapshot of a party's income, and that's what this court has chosen to do for this order. This is a temporary order, and it's based upon what I have in front of me today and the best effort of the court to determine the income available for support, keeping in mind what [Husband] can pay, is able to pay, and more importantly, what he is reasonably capable of paying if he applies himself intelligently and aggressively to earn income as he historically demonstrated. [¶¶] I used [Husband's] – what I believe to be seriously underreported income of $1,367 per month for the months of 2011, but I used [Wife's counsel's] computations of his monthly income at . . .

5

$23,361 for 2009, $22,152 for the year 2010, and use a *Riddle* approach. [¶] Hence, my conclusion . . . [is] that [Husband's] monthly income self-employment is $15,626 . . . , and no dispute in the evidence by both sides as to [Wife's] income at $2800 per month." (Italics added.)

An order was filed October 28, 2011.

Husband contends the trial court erred in (1) including income from 2009 and 2010 in calculating 2011 cash flow, (2) applying the *Riddle* formula to the years 2009-2011, (3) erred in imputing that monthly cash flow, (4) awarding Wife $3,654 a month in support when his monthly income was only $1,367.

### c. *Determining spousal support*

In making spousal support orders, the court must consider and weigh any of the relevant circumstances enumerated in Family Code section 4320.[1] These circumstances include, inter alia: (1) the marital standard of living; (2) contributions to the supporting spouse's education, training or career; (3) the supporting spouse's ability to pay; (4) the needs of each party based on the marital standard of living; (5) the obligations and assets of each party, the duration of the marriage; (6) the opportunity for employment; (7) the age and health of the parties; (8) tax consequences; (9) the balance of hardships to the parties; and (10) the goal that the supporting party be self-supporting within a reasonable period of time. (§ 4320; *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 302-304.) The supporting spouse's ability to pay is a key factor. (*Id.* at p. 304.)

Generally, temporary spousal support and permanent spousal support serve different purposes and are subject to different statutory requirements. (*In re Marriage of Murray* (2002) 101 Cal.App.4th 581, 594.) Section 3600 permits an award of temporary spousal support to maintain the living conditions and standards of the parties as close to the status quo as possible pending trial. The purpose of permanent spousal support is to provide financial assistance as determined by the financial circumstances of the parties after their dissolution and the division of community property. (*Ibid.,* citing *Marriage of*

---

[1] Statutory references are to the Family Code unless otherwise stated.

6

*Burlini* (1983) 143 Cal.App.3d 65, 68.) In calculating a temporary support award, the trial court determines the supporting spouse's ability to pay, and may consider income, investments and other assets. It then considers the other spouse's needs. (*Murray, supra,* 101 Cal.App.4th at p. 594.)

The court is not restricted by any set of statutory guidelines in fixing temporary spousal support. (*In re Marriage of Wittgrove* (2004) 120 Cal.App.4th 1317, 1327.) "Rather , in exercising its broad discretion, the court may properly consider the 'big picture' concerning the parties' assets and income available for support in light of the marriage standard of living. [Citation.] Subject only to the general 'need' and 'the ability to pay,' the amount of a temporary spousal support award lies within the court's sound discretion, which will only be reversed on appeal on a showing of clear abuse of discretion. (*In re Marriage of Murray*[, *supra,*] 101 Cal App 4th [at p.] 594.)" (*Marriage of Wittgrove, supra*, 120 Cal.App.4th at p. 1327.)

An abuse of discretion will be found when the trial court's order exceeds the bounds of reason, that is, when it can be fairly said that no judge would have made the same order under the circumstances. (*In re Marriage of Bower* (2002) 96 Cal.App.4th 893, 898-899; *In re Marriage of Reynolds* (1998) 63 Cal.App.4th 1373, 1377.) "Generally, where a trial court has discretionary power to decide an issue, an appellate court is not authorized to substitute its judgment for that of the trial judge." (*In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 682.)

### d. Riddle

In *In re Marriage of Riddle, supra,* 125 Cal.App.4th 1075, the husband worked as a financial advisor for a major investment firm. (*Id.* at p. 1977.) The wife did not work outside the home and had no income. The husband's compensation was complicated because he had received an advance in excess of $1 million from his employer during the marriage, and the employer was forgiving the debt. The husband's monthly paychecks reflected his draw, his commission, and an additional amount which compensated him for the repayment of the advance. The trial court calculated child and spousal support by using two months of income during the year the petition was filed. The court of appeal

7

determined that it was an abuse of discretion to use such a short period of time to calculate support. (*Id.* at p. 1083.) The court noted that while the governing statutes (sections 4060 and 4064) appear to create a presumption that the most recent 12 months is an appropriate period in most cases, a longer or shorter period could be used if it were more representative of a party's income. (*Id.* at pp. 1083-1084.)

Section 4060 provides: "The monthly net disposable income shall be computed by dividing the annual net disposable income by 12. If the monthly net disposable income figure does not accurately reflect the actual or prospective earning of the parties at the time the determination of support is made, the court may adjust the amount appropriately."

Section 4064 provides: "The court may adjust the child support order as appropriate to accommodate seasonal or fluctuating income of either parent."

The *Riddle* court explained that while both section 4064 and 4060 are framed in discretionary terms, it is also well established that the court's discretion must be a reasonable one, and take into consideration the circumstances of the parties, their necessities and the financial ability of the supporting spouse. (*In re Marriage of Riddle, supra,* 125 Cal.App.4th at p. 1081.)

*Riddle* explained the court must arrive at a stable number in order to make a support order, even if the supporting spouse's income is not stable. The stable number must be a reasonable predictor of what each spouse or parent will earn in the immediate future. "The theory is that the court is trying to predict likely income for the immediate future, as distinct from extraordinarily high or low income in the past." (*In re Marriage of Riddle, supra,* 125 Cal.App.4th at p. 1081.)

"[T]he time period on which income is calculated must be long enough to be representative, as distinct from extraordinary." (*In re Marriage of Riddle, supra*, 125 Cal.App.4th at p. 1081.) It is an abuse of discretion "to take so small a sliver of time to figure income that the determination essentially becomes arbitrary." (*Id*. at p. 1083 [two months].) As a general rule, the most recent 12 months is appropriate in most cases, but may not be in some. (*Id*. at p. 1083.)

In *In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, the husband was a lawyer whose income varied dramatically in the four years prior to the divorce. The wife presented an expert who used the most recent, and coincidentally highest year on which to base the goodwill value of his practice. On appeal, the court said the expert should have averaged the four years. (*Id.* at p. 820.)

Husband contends Wife's documentation was not sufficient to establish his current ability to pay, particularly since she made more money than he did in 2011. He also contends no reasonable judge would have applied a *Riddle* analysis by using his income from 2009 and 2010.

Husband claims the facts in this case are similar to *In re Marriage of Rosen, supra,* 105 Cal.App.4th 808. In *Rosen*, the husband was a self-employed attorney and his income fluctuated from month to month. During a three-year period following separation, he claimed his monthly gross income went from $11,232 to $8,771 to $7,695. (*Id.* at p. 816.) Wife's expert used one year's earnings, one of the highest earning years to calculate annual income and value of goodwill. (*Id.* at pp. 819-820, 824.) Husband testified about his gross income for the year before trial and provided an income tax return. Wife's expert used an eight-month period during the year the petition was filed. That year was one of husband's highest earning years. (*Id.* at p. 820.) On appeal the court held that the trial court's finding of husband's monthly salary was unsupported by the evidence. (*Id.* at p. 826.)

*Rosen* does not aid Husband. In *Rosen*, the trial court relied on the wife's expert's opinion in determining the goodwill value of the husband's law practice. The expert used only an eight-month period from the husband's highest-earning year to determine the husband's cash flow. The trial court held that an average of several relevant years should be used to calculate income and that one year's net income was not a reasonable basis to determining the goodwill of a practice with a fluctuating income. (*In re Marriage of Rosen, supra,* 105 Cal.App.4th at pp. 820-821.)

Husband also contends the court erred in using his income from 2009 and 2010 because the economic recession was the reason for the lack of income in 2011, citing

9

*Acosta v. Brown* (2013) 213 Cal.App.4th 234. That opinion referred to facts stated in the record about the economic recession which began in 2008 and the number of claims for unemployment insurance benefits from 2007 to 2009. (*Id*. at p. 245.) Husband also cites *Marriage of Ficke* (2013) 217 Cal.App.4th 10 for the proposition that the recession started in 2008 and lasted until 2011.[2] That case, however, does not say the recession lasted until 2011; it states that "[F]air market value in October 2008, just as the great recession was getting started, is obviously not necessarily representative of fair market value by the time of trial over the course of 2010 and 2011." (*Id*. at p. 15.)

The court indicated it was doubtful of Husband's claims, calling his income "seriously underreported," but used Husband's 2011 figure in its calculation. Husband also claimed the other reasons for the drop in income were "business reversals, lost case, personal illness," but did not demonstrate a change of careers or a disability which hampered his legal abilities.

The use of the years 2009 and 2010 was not an arbitrary decision. They were the years immediately prior to the filing of the petition. The court's failure to include the years of 2007 and 2008 (in which he earned approximately $120,000 annually) in its computation is entirely reasonable, since those years were more remote in time.

It was not an abuse of discretion for the court to base its support order on income from three prior calendar years where evidence showed that for the two years prior to the divorce Husband had earned income in amounts almost 20 times what he claimed to be earning in the year the dissolution petition was filed.

It is clear, here, however, that the trial court accepted Husband's claim that his 2011 income was much less than what he made in 2009 and 2010 and took that fact into account when granting spousal support. Using documents prepared by Husband, the court computed monthly income of $23,361 for 2009, $22,152 for 2010 and $1,367 for

---

[2]    Husband also filed a request that we take judicial notice that the economic recession began in 2008. In light of the language in *Acosta v. Brown*, *supra*, 213 Cal.App.4th at page 245, we grant this request.

2011, and found the average of those three years to be $15,626 per month. The trial court's order thus was not based on an unrealistic assessment of what Husband earned. (*In re Marriage of Riddle, supra,* 125 Cal.App.4th at pp. 1085-1086*; In re Marriage of Cohn* (1998) 65 Cal.App.4th 923, 931.)

### e. Marital standard of living

Husband argues the trial court erred in considering the marital standard of living because it was irrelevant.

"Although a court may properly consider both income and expenses in determining the marital standard of living [citation], it may also base it on the family's average income, rather than expenses. [Citation.] Average income is particularly appropriate where, as here, there was evidence the parties lived beyond their means. [Citation.] . . . . [¶] . . . Whether the parties were living beyond their means is an appropriate factor for the trial court to balance against other considerations in order 'to reach a "just and reasonable" result.' [Citations.]" (*In re Marriage of Ackerman* (2007) 146 Cal.App.4th 191, 208.) The trial court must make specific factual findings with respect to the standard of living during the marriage. (*In re Marriage of Rosen, supra*, 105 Cal.App.4th at p. 825.)

When the actual marital standard of living is beyond the parties' means, it has reduced significance as a point of reference in determining a spouse's reasonable needs. (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 485-486.)

Husband contends the court should not have considered the marital standard of living. Although section 4320 requires the court to consider the marital standard of living as a factor in determining permanent support, in a temporary support case, the court is not restricted to the factors enumerated in section 4320 and may use its discretion in basing its order on the marital standard of living. (*Marriage of Wittgrove, supra*, 120 Cal.App.4th at p. 1327.) Review of the trial court's remarks indicates that it felt the marital standard of living was an issue which required further discovery based upon Husband's representations that the parties spent far beyond their means. The marital standard of living was clearly a point of reference which needed to be used in

11

determining permanent spousal support and the trial court recognized that it needed further information on that issue. So in terms of the temporary support award, the marital standard of living was only considered to the extent that Husband claimed he had a high amount of expenses.

 *f. Imputation of income*

 Husband contends the court erred in imputing income to him for 2011.

 Income may be imputed where a spouse does not have a paying job, is undertaking a new business venture, or has deliberately refused to obtain employment. (*In re Marriage of Riddle, supra,* 125 Cal.App.4th at p. 1086.)

 In this case, the court did not impute income to Husband; it used the *Riddle* approach in determining his net monthly income for the year 2011. It accepted as true Husband's claim that he only earned $17,000 the year the petition was filed. It simply took evidence of his much higher income from the preceding two years prior, accepted his claim of a drastically reduced salary in 2011 and averaged the amounts earned in 2009, 2010 and 2011 to come to a monthly income figure for use in computing guideline support.

 In any event, the trial court did not err in assuming that Husband would be able to pay spousal support in excess of the $1,367 per month he claimed he was earning. The trial court may consider earning capacity in determining spousal support. (*Cheriton, supra,* 92 Cal.App.4th at p. 308.) The trial court indicated Husband was capable of paying support because of his ability to earn a high income in the past but did not base its order on an imputation of income.

 Earning capacity means "'the income the spouse is reasonably capable of earning based upon the spouse's age, health, education, marketable skills, employment history and the availability of employment opportunities.' [Citation.]" (*In re Marriage of Cheriton*, *supra,* 92 Cal.App.4th at p. 301.) Earning capacity should not be based upon an extraordinary work regimen but instead upon an objectively reasonable work regimen as it would exist at the time the determination of support is made. (*In re Marriage of Simpson* (1992) 4 Cal.4th 225, 234-235; *In re Marriage of Lim and Carrasco* (2013) 214

12

Cal.App.4th 768, 775-778.) "A reasonable work regimen . . . however, is not readily or precisely determined and is dependent upon all relevant circumstances, including the choice of jobs available within a particular occupation, working hours, and working conditions. . . ." (*In re Marriage of Simpson, supra,* 4 Cal.4th at pp. 235-236.)

We determine that the trial court did not abuse its discretion in fashioning the temporary support order. It did not impute income to Husband for the year 2011, but considered his earning capacity using his past income, his ability to continue to practice law, and his ability to obtain employment in the past at several law firms, in order to determine earning capacity.

### g. *Other arguments raised by Husband*

Husband raises a plethora of other claims regarding the support order. Husband claims the trial court erred in imposing the burden of proof on him to show an inability to pay support. He bases this contention on the court's statement: "[Husband] does not have a complete information for 2011." We do not read this comment as imposing the burden of proof on Husband but merely a recognition by the trial court that because the hearing took place in October 2011, Husband could not have provided complete information for the entire year. The court also stated it found Wife's summary and compilation of the evidence in the file to be persuasive as to the years 2009 and 2010.

Husband argues he produced all the information he could and that Wife had the burden of proof and she did not show he had the ability to pay the amount of support ordered. Husband contends the support order was in the nature of a sanction imposed on him because he did not produce stronger evidence.

Husband argues *Bardzik, supra,* 165 Cal.App.4th 1294 held that the party moving for support has the burden of proof. Contrary to his contentions, *Bardzik* held only that in a motion for modification of child support, the moving party has the burden of proving changed circumstances. (*Id.* at p. 1303.) It noted that a payor spouse seeking a reduction in child support payments must show a lack of her ability to pay and an opportunity to earn more. (*Id.* at p. 1308.)

13

Husband contends the court ordered him to borrow money to pay for expenses. A review of the record indicates this did not occur. Husband stated in his Income and Expense Declaration that he had borrowed money from his prior wife's mother, Ms. Newman. Wife's counsel argued that Husband had borrowed money from Newman before and "appears to continue to be able to have the ability [to] borrow money from her now." The court stated in its ruling: "This is a temporary order, and it's based upon what I have in front of me today and the best effort of the court to determine the income available for support, keeping in mind what [Husband] can pay, is able to pay, and more importantly what he is reasonably capable of paying if he applies himself intelligently and aggressively to earn income as he historically demonstrated." There is nothing in its ruling ordering Husband to borrow money.

Husband also contends Wife lied on her request for spousal support by saying he earns over $26,000 after business expenses and referred to his disability payments even when she knew those payments would cease after he turned 65. The court, however, did not use his disability payments in its calculation of his net income.

### h. Conclusion

To the extent that a trial court's exercise of discretion is based on the facts of the case, it will be upheld as long as its determination is within the range of evidence presented. (*Marriage of Ackerman, supra,* 146 Cal.App.4th at p. 197.)

As we have indicated above, the amount of temporary support was well within its wide discretion. The trial court's ruling was clearly supported by documentation offered by both parties. No abuse of that discretion has been shown.

## II. The Temporary Restraining Order

Approximately two months after the petition for dissolution was filed, Husband filed a request for a Domestic Violence Prevention Order (§ 6220) against Wife. He explained that the family home has two floors and seven bedrooms. Each of Wife's two sons has a bedroom. Wife sleeps in her own bedroom downstairs with its own bathroom. He requested an order that Wife "move out from and not return to" the master bathroom and the master bedroom at their home. In 2006, Wife moved out of their bedroom and he

14

filed a petition for divorce but dismissed it. He then filed another petition in March 2011. He hid the original petition at home in a drawer and put another copy in his attaché case. Both copies disappeared. He submitted a declaration which stated that he was taking an antidepressant during their marriage. In May 2011, he noticed that one of his antidepressant pills had been replaced with one containing Vicodin, a narcotic pain medication. He claimed Wife was the only one with the means and motive to achieve this substitution.

The court denied Husband's restraining order request.

The parties agreed to sell the family residence in a stipulation dated August 11, 2011.

On August 29, 2011, Wife filed an application for a domestic violence temporary restraining order against Husband. She submitted a declaration in which she stated, inter alia, that he committed battery on her on August 11, 2011 and August 27, 2011 and on two other occasions during the course of their eight-year marriage. She stated he verbally abused her and her son Dylan. She claimed Husband had a long history of alcohol and prescription drug use. She attached pictures of the bruises of her forearm. Husband admitted taking the computer router, which she used for her business. She attempted to take a picture of the router which was in his bedroom, and stated he lunged at her, and struck her violently on her forearm. After the incident Wife filed a police report and the police took statements from her and her 11-year-old son. She stated Husband verbally abused her in front of the kids, repeatedly made loud commotions at the home, disconnected internet service which she needed for her job, started a fire with his space heater, damaged cable television wires, and interfered with the court orders for sale of the house by locking doors to his room

Dylan, Wife's 19-year-old son, submitted a declaration which stated he witnessed Husband disconnecting the internet wires. Dylan also stated Husband accused him of stealing and banged on his bedroom door in the early morning hours.

Husband filed an Answer to Wife's request for a restraining order accusing Wife of childish pranks. He described the camera incident as Wife rushing towards his

bathroom and taking a picture.  They collided.  He denied hitting her and stated she must have incurred the bruises as a result of her charging at him.  He denied interfering with the sale of the house or Wife's business.  He denied creating loud commotions and stated he had already moved out of the house.  With respect to the alleged drug and alcohol abuse, he stated that the only evidence submitted by Wife were copies of her inappropriate communications to his therapist.

Beginning on September 30, 2011, the court held a hearing on Wife's domestic violence application.  The hearing concluded on October 7th.  At the hearing, Wife testified.  Both Husband and Wife were represented by counsel.  By the time of the October 6th hearing, Husband was representing himself, so he conducted the cross-examination of Wife and testified on his own behalf, with the court asking some questions.

The court found Husband did controvert some, but not all, of Wife's contentions, but "[t]he evidence showed more persuasively on [Wife's] side than [Husband's] side that the [Husband] has exercised threats, intimidation, control, both of the physical environment and of a verbal nature to individuals in the household including minor children . . . by continually engaging in, as he called it, 'gamesmanship' or 'games' which he admits. . . .  All of this when coupled with what I found to be greater escalation of these events by [Husband].  The blocking of [Wife] taking a picture was found to be more of a defensive nature on his part, but there have been threats. . . .  I found the camera and blocking incident to be legitimately self-defense, but cumulatively with the threats of altercation, with the threats of ultimatum, with removing access to the internet and the cable television, with making statements in front of the [Wife], to the minor child of [Wife] of an intimidating nature, the refusal to create the plan to move out or move on and separate were, in the court's mind, cumulative evidence—substantial evidence of exercise of control, warranting a need for the parties to stay away from each other.  In addition, I found [Wife's] testimony and her demeanor and affect on the witness stand and in court to be more persuasive than the [Husband's]."

16

On October 7, 2011 the court granted a restraining order against Husband, ordering him to stay 110 yards away from Wife for three years.[3]

Husband contends the trial court was prejudiced against him, that Wife committed perjury and lied in her application.

Husband contends that Wife committed perjury by answering that she did not install spyware on Husband's computer as shown by her subsequent testimony that she ordered it and had it downloaded. Husband also claims that she "protested too much" when she responded to the accusation of planting spyware, which was evidence of untruthfulness and that she later admitted she had an interest in downloading spyware. Husband also contends that he left a handwritten note next to his fax as "bait" to trap Wife because she had installed spyware. In the note he said he was researching guns and poison. Wife used this information about guns to support her application for protective order. Husband contends that because the fax was not true, it cannot be used to have the restraining order granted.

Husband contends Wife lied in her request for a restraining order because she did not know if the alleged "body slam" pushed her back and she is smaller than Husband, so she would have bounced back. Husband contends Wife lied about the camera incident because it was not possible for her to see a router in his room using a small digital camera. Husband also contends Wife was not truly fearful of him since she confronted him with her 11-year-old son in the house and also repeatedly asked him when he would be moving out.

---

[3]    After the notice of appeal was filed from the October 7th restraining order, on December 9, 2011, Husband filed a request to modify the restraining order, stating he had been denied access to the house. He claimed that Wife had perjured herself in the request for the restraining order. He said he took the deposition of the Sheriff's Deputy who arrived on August 27, 2011, when Wife claimed he had assaulted her. Sergeant Holland stated that it was his opinion that Wife had falsely reported the domestic violence. There is no copy of a transcript from the deposition, nor does it appear that a videotape was lodged with the court. Husband then filed his own request for a domestic violence order prohibiting Wife from removing anything from the home.

17

On appeal from the issuance of a domestic violence temporary restraining order, we apply an abuse of discretion standard of review to determine whether the trial court exceeded the bounds of reason. (*Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 420 (*Gonzalez*); *Quintana v. Guijosa* (2003) 107 Cal.App.4th 1077, 1079 (*Quintana*).) "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*Gonzalez, supra*, 156 Cal.App.4th at p. 420, citing *Shamblin v. Brattain* (1988) 48 Cal.3d 474, 478-479.)

The Domestic Violence Prevention Act (DVPA) authorizes issuance of a restraining order "to prevent the recurrence of acts of violence and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of violence." (§ 6220; *Gonzalez, supra,* 156 Cal.App.4th at p.421.) "The Legislature has set forth the relevant factors in Family Code section 6300, by providing that a domestic violence restraining order may be issued 'if an affidavit shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse.'" (*Quintana*, *supra*, 107 Cal.App.4th at p. 1079; *Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 334.) Abuse is defined as intentionally or recklessly causing or attempting to cause bodily injury, sexual assault, or placing a person "in reasonable apprehension of imminent serious bodily injury to that person or to another." (*Gonzalez*, *supra*, 156 Cal.App.4th at p.421; § 6203.)

Courts construe the DVPA liberally, and may issue a domestic violence restraining order when the applicant makes the requisite showing by a preponderance of the evidence. (*Gdowski v. Gdowski* (2009) 175 Cal.App.4th 128, 137.)

Here, nothing in the trial court's record demonstrates the court erred in exercising its discretion. Wife's petition for a temporary restraining order described particular incidents of abuse that occurred when Husband and Wife were living together. The trial court also heard both Husband's and Wife's testimony and considered the declaration of Wife's son, who was living in the house.

18

We defer to the trier of facts on issues of credibility because it is a function of the trial court to evaluate the parties' testimony and the evidence they present. Thus, "'[n]either conflicts in the evidence nor "'testimony which is subject to justifiable suspicion . . . justif[ies] the reversal of a judgment, for it is the exclusive province of the [trier of fact] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'"'" (*Lenk v. Total-Western, Inc*. (2001) 89 Cal.App.4th 959, 967.) The trial court heard the testimony of both Husband and Wife and made a credibility decision. Based upon the evidence presented, the facts were sufficient to warrant a temporary restraining order.

*III. Attorney fees*

Section 2030 permits the trial court to order payment of attorney fees and costs according to the parties' respective incomes and needs and to ensure that each party has access to legal representation. "The purpose of such an award is to provide one of the parties, if necessary, with an amount adequate to properly litigate the controversy." (*In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 629.) The court shall take into account each party's assets, debts, income, earning ability, ability to pay, age and health as well as the duration of the marriage. (*Id.* at p. 630.)

An award of attorney s fees is reviewed for abuse of discretion and we must affirm it unless no judge could reasonably make the order. (*In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, 829.)

In her OSC, Wife requested $25,000 in attorney fees and costs in the amount of $7,500 as well as a contribution of $7,500 in forensic accounting fees.

The court ordered Husband to pay an initial contribution of $20,000 in attorney fees and a $7,500 contribution towards forensic accounting fees.

The trial court stated, "Regarding attorney's fees, the goal of pendente lite or temporary attorney fee order is to level the playing field or to provide resources to the party who has fewer resources. Here, [Husband] clearly has superior resources by his income which is at a figure of approximately seven times greater than [Wife] by my calculation, perhaps ten times more than [Wife] if by [Wife's] calculation. The court

finds . . . that it is appropriate for this court to award fees in this case, that [Husband] has the ability to fund the attorney's fees and costs for both parties in this case. He is age 65 and is out of receiving his disability, which notably was not calculated in the support, and he may not have access to those funds in the future as he did in the past, but he clearly has the ability to earn significant amounts of money as an attorney every year. The health issues were described by [Husband] during the hearing in his medication and in his emotional state and who is under care for [*sic*]. The court takes that into account somewhat in his favor. . . . [Wife] has two children still supporting not of this marriage. . . . She has the ongoing expenses of dealing with relocation to a house once this house has gone to foreclosure or sale."

Husband contends there was no substantial evidence of ability to pay, citing section 2030 and also contends he has a right to counsel.

Husband stated at the continued hearing on October 6, 2011 that he was no longer represented by counsel because he "ran out of money."

We find no abuse of discretion in the trial court's award of attorney fees and forensic accounting fees. Not only did Husband have a higher income ability than Wife, he was a lawyer and able to represent himself. The court properly took into account his age, health, the children who were living at home, and the Wife's living situation. The award was entirely reasonable given the circumstances of the parties.

*DISPOSITION*

The orders of October 7, 2011 are affirmed. Wife shall recover her costs on appeal.


                                                     **WOODS, J.**

**We concur:**


       **PERLUSS, P. J.**                                      **SEGAL, J.**[*]

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

20